GARY A. DAVIS (SBN 098792)
Davis & Whitlock, P.C.
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Telephone: (828) 622.0044
Fax: (828) 398.0435
Email: gadavis@enviroattorney.com

JAMES M. BIRKELUND (SBN 206328)
Law Offices of James Birkelund
548 Market St., # 11200
San Francisco, CA 94105
Telephone: (415) 602.6223
Fax: (415) 789.4556
Email: james@birkelundlaw.com

RACHEL S. DOUGHTY (SBN 255904)
Greenfire Law
1202 Oregon Street
Berkeley, CA 94702
Telephone: (828) 424.2005
Email: rdoughty@greenfirelaw.com

Attorneys for Plastic Pollution Coalition,
a project of Plaintiff Earth Island Institute

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PLASTIC POLLUTION COALITION, a project of EARTH ISLAND INSTITUTE, a non-profit corporation,** | Case No. _____ |
| **Plaintiff,** | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES |
| v. | |
| **PENTAIR THERMAL MANAGEMENT, LLC**. | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.*) |
| **Defendant**. | |

Plaintiff Plastic Pollution Coalition, a project of Earth Island Institute ("Plastic Pollution Coalition"), files this Complaint and alleges as follows:

## NATURE OF THE CASE

1.      This is a citizen's suit, brought pursuant to the provisions of Section 505(a)(1) of the federal Clean Water Act ("CWA"), as amended, 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendant Pentair Thermal Management, LLC, ("Pentair") arising out of Pentair's industrial activities at its facilities located on an approximately five-acre site in Redwood City, California (the "Facility").

2.      More specifically, since at least April 7, 2009, Pentair has discharged pollutants into waters of the State of California and the United States through the public storm drains which drain to the San Francisco Bay, in violation of 33 U.S.C. 1311(a) and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 ("Storm Water Permit"). Pentair has failed to comply with the requirements of the Storm Water Permit which are designed to prevent discharges of pollutants, including the monitoring, reporting, and revision of management practices of the Storm Water Permit.

3.      Plaintiff Plastic Pollution Coalition seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs (including attorney and expert witness fees) for Pentair's repeated and ongoing violations of the CWA.

## JURISDICTION

4.      This Court has subject matter jurisdiction over the CWA claims set forth in this Complaint pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

5.      Plaintiff has complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plastic Pollution Coalition, on May 1, 2014, mailed a notice of intent to file suit under the CWA to address the violations at the

Facility to: Pentair, the U.S. Attorney General, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Director of the State Board, and the Executive Director of the San Francisco Bay Regional Water Quality Control Board ("Regional Board") ("May Notice"). [Attached hereto as Exhibit "A" and incorporated herein by reference.] The May Notice complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since the May Notice was served on Pentair and these agencies.

6.     Neither the EPA nor the State Board nor the Regional Board has commenced, nor is any one of these agencies diligently prosecuting, a civil or criminal action in a court of the United States or the State to redress the violations of the CWA by Pentair. In addition, none of these agencies has commenced an administrative penalty action under Section 309(g) of the CWA, 33 U.S.C. § 1319(g), or under a comparable California law, to redress the violations of the CWA by Pentair.

7.     Plastic Pollution Coalition will, immediately upon receipt of a file stamped copy of this Complaint, mail a copy of this Complaint to Administrator of the EPA, the Regional Administrator of the EPA Region 9, and the Attorney General of the United States.

## VENUE AND INTRADISTRICT ASSIGNMENT

8.     Venue is appropriate in the Northern District of California, pursuant to Section 505(c) of the CWA, 33 U.S.C. § 1365(c), because the source of the violations is located in San Mateo County within this judicial district.

9.     Pursuant to Civil L.R. 3-2(c) and 3-2(d) this action arising in San Mateo County is appropriately assigned to either the San Francisco or Oakland Division.

## THE PARTIES

10.     Plastic Pollution Coalition is a project of Earth Island Institute, a not-for-profit corporation. Plastic Pollution Coalition is a global alliance of individuals, organizations, and businesses working towards a world free of plastic pollution and its toxic impacts. With its work, Plastic Pollution seeks to put plastic pollution at the forefront of global social,

1  environmental, and political discourse. Plastic Pollution Coalition is headquartered in

2  California, as is its sponsor, Earth Island Institute, and much of Plastic Pollution Coalition's

3  work and membership is located in California. Earth Island Institute's and/or Plastic Pollution

4  Coalition's members work, recreate, and live on or near the San Francisco Bay ("Bay")

5  downstream of the Facility and the Facility's discharge. Several have professional interests in

6  the Southern portion of the Bay. Members of Plastic Pollution Coalition have been, and will

7  continue to be, directly and substantially injured in their use and enjoyment of their property

8  and/or in their recreational and aesthetic enjoyment of the San Francisco Bay as a direct result

9  of Pentair's violations of the CWA. The relief sought in this case would provide redress for

10  these injuries. Additionally, because these injuries are being caused by pollution of waters of the

11  United States, the injuries fall within the zone of interests protected by the CWA.

12      11.    Plastic Pollution Coalition has standing to bring this lawsuit.

13      12.    Earth Island Institute is a not-for-profit, public interest, membership corporation

14  that supports people who are creating solutions to protect our shared planet. Earth Island

15  Institute's headquarters are located in Berkeley California. Earth Island Institute acts as an

16  incubator for start-up environmental projects, giving crucial assistance to groups and individuals

17  with new ideas for promoting ecological sustainability, including the Plastic Pollution Coalition.

18  Members of Plastic Pollution Coalition are also members of Earth Island Institute, and so their

19  injury resulting from pollution from the Facility is identical to those alleged above in paragraph

20  9.

21      13.    Earth Island Institute, in its own right and through its project, Plastic Pollution

22  Coalition, has standing to bring this lawsuit.

23      14.    Pentair is a Delaware Limited Liability Company authorized to do business in

24  California, operating in San Mateo County. Pentair is an international diversified company

25  producing thermal management products, including heating cables, at its Facility.

26

27

28

## STATUTORY AND REGULATORY FRAMEWORK

15. The objective of the CWA is to restore and maintain the "chemical, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). In accordance with that objective, Section 301(a) of the CWA makes the discharge of any pollutant by any person unlawful, unless in compliance with a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

16. The State of California has been delegated the authority to implement the permitting programs of the Act by EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b). The State Water Resources Control Board is the water pollution control agency for purposes of the Act, and has drafted regulations pursuant to that authority implementing the Act's permitting programs within the State of California.

17. To implement the Act's permitting program for discharges of storm water associated with industrial activities, the State Board has adopted the Storm Water Permit (NPDES General Permit No. CAS000001). In California, any person who discharges storm water associated with industrial activity must comply with the terms of the Storm Water Permit, unless they have an individual NPDES permit covering their storm water discharges. Broadly, the Storm Water Permit prohibits discharges of materials other than storm water directly or indirectly to waters of the United States and requires covered facilities to implement pollution prevention measures to reduce storm water pollution. The Storm Water Permit imposes a duty upon those covered by it to take all responsible steps to minimize or prevent any discharge in violation of the Storm Water Permit.

18. Noncompliance with the Storm Water Permit constitutes a violation of the CWA and California's Porter-Cologne Water Quality Control Act. Cal. Water Code §§ 13263, *et seq*.

19. A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for violations of the terms and conditions of NPDES permits, as well as for discharges of pollutants from a facility into waters of the United States without a valid NPDES permit. 33 U.S.C. § 1365(f).

20. The Storm Water Permit implements the requirements of the CWA through both technology-based provisions and water quality-based standards. The Storm Water Permit sets

out four basic requirements for permittees: (1) effluent limitations, (2) receiving water limitations, (3) the implementation of a Storm Water Pollution Prevention Plan ("SWPPP"), and (4) the development of a Monitoring and Reporting Program ("MRP").

21.     The Storm Water Permit requires that facility operators reduce or prevent pollutants associated with industrial activity through the implementation of the best available technology economically achievable ("BAT") for toxic and non-conventional pollutants and the best conventional pollutant control technology ("BCT") for conventional pollutants.[1] A facility operator can comply with this requirement by developing and implementing a Storm Water Pollution Prevention Plan ("SWPPP") that (1) complies with the requirements specific to the SWPPP, as listed in Section A of the Storm Water Permit and (2) includes best management practices ("BMPs") that achieve BAT/BCT. *Id.*

22.     The EPA has established benchmarks for pollutant discharges ("EPA Benchmarks"), which serve as the parameters to determine if a facility is properly implementing safeguards and procedures to prevent unlawful discharges. The EPA Benchmarks are relevant and objective standards to evaluate whether a facility has implemented the requisite BAT and BCT. Relevant to the present action, they include 100 milligrams per liter (mg/L) for total suspended solids ("TSS"), 15 mg/L for oil and grease, 110 mg/L for total organic carbon ("TOC"), a pH of between 6.0 and 9.0, 0.75 mg/L for aluminum, 1 mg/L for iron, 0.0636 mg/L for Copper, and 0.117 mg/L for Zinc.

23.     The Storm Water Permit prohibits the discharge of water that causes or contributes to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or applicable Regional Water Board's basin plan--here the San Francisco

---

[1] Conventional pollutants are those typical of municipal sewage, and for which municipal secondary treatment plants are typically designed as biological oxygen demand (BOD), total suspended solids (TSS), fecal coliform bacteria, oil and grease, and pH. 40 C.F.R. § 401.16. Toxic pollutants are listed by chemical in the U.S. EPA's regulations. See 40 C.F.R. § 401.15. Nonconventional pollutants are all pollutants that are not included in the list of conventional or toxic pollutants in 40 C.F.R. Part 401. Nonconventional pollutants include pollutants such as chemical oxygen demand (COD), total organic carbon (TOC), nitrogen, and phosphorus.

Bay Water Quality Control Plan ("Basin Plan"). The Basin Plan contains "discharge prohibitions applicable throughout the region" including effluent limitations limiting pH values for effluent to between 6.5 and 9.

24.    The State Board also informs facilities that the acceptable range of pH values in storm water discharges is between 6.5-8.5, rendering any measures below 6.5 as unacceptably acidic.

25.    The Storm Water Permit requires that permittees develop and implement a SWPPP that meets certain requirements. The SWPPP has two major objectives: (1) to identify and evaluate sources of pollutants and (2) to identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. Among other things, a SWPPP must contain a compliance activity schedule, a description of industrial activities and pollutant sources, a description of BMPs, drawings, maps (including a site map), and relevant copies or references of parts of other plans. A permittee must evaluate and update the SWPPP with additional BMPs necessary to achieve compliance with the Storm Water Permit.

26.    The Storm Water Permit requires a permittee to develop a Monitoring and Reporting Program ("MRP"). As part of the MRP, a permittee must conduct visual observations of storm water throughout the Wet Season; must collect water samples at each outfall during specific times; must analyze these samples for specific contaminants; and must file Annual Reports with the Regional Board summarizing the visual observations, results of sampling analysis, and Storm Water Permit compliance. The MRP should inform changes in management. Response must be taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water discharges. The SWPPP must be revised as necessary to ensure compliance with the Storm Water Permit.

## GENERAL FACTUAL ALLEGATIONS

27.    For the relevant time period for the violations alleged in this Complaint, the Facility was operated by Pentair Thermal Management, LLC, and Tyco Thermal Controls. In 2012, a

merger between Pentair's parent company, Pentair Inc., and Tyco International Ltd. created a new entity, Pentair Ltd, which is the parent of Pentair Thermal Management, LLC. Prior to 2013 Annual Storm Water Reports were filed in the name of Tyco Thermal Controls.

28.   Pentair engages at the Facility in industrial manufacturing processes to produce heat tracing and leak detection products for infrastructure industries. Pentair handles a wide array of industrial materials and wastes at the Facility, including plastic pellets, plastic color concentrates for film and injection molding applications, plastic compounds, carbon paper, and powder coating application, modified copolymers of ethylene and tetrafluoroethylene, antimony, copper, zinc, aluminum, iron, and other chemicals.  Sources of pollutants associated with the industrial activities at the Facility are not adequately described in the facilities' reporting materials but appear to include industrial processes related to plastic nurdles and the receiving, shipping, and storage of hazardous materials.

29.   Pentair engages in industrial activities at the Facility that require it to report under and comply with the Storm Water Permit.

30.   Pentair discharges storm water into at least 10 storm drains and one valley gutter. The Facility collects and discharges storm water from its operations into channels that ultimately flow into the San Francisco Bay.

31.   San Francisco Bay is "waters of the United States," as that term is used in the CWA and as it has been interpreted by the federal courts.

32.   Pentair is required to file an Annual Report for Storm Water Discharges Associated with Industrial Activities each year, which, among other things, reports on the results of samples of storm water discharged from Pentair. During the last 5 years, Pentair's reports demonstrate exceedances of the EPA's benchmarks over 40 times.  See, e.g., Exhibit A (listing numerous exceedances). Storm water discharges from the Facility in violation of the Storm Water Permit include: zinc discharged at 141 times the EPA's benchmark; aluminum, copper, and lead discharged at 10 times EPA's benchmarks; and iron discharged at 16 times the EPA's benchmark.

33.    Storm water discharge samples collected and analyzed by Pentair not only had high levels of toxic metals but also total suspended solids ("TSS") in excess of the EPA Benchmark of 100 mg/L for TSS and total organic carbons ("TOC") in excess of the EPA benchmark of 110 mg/L for TOC.

34.    The Basin Plan includes effluent limitations limiting pH values for any effluent to between 6.5 and 9, and the EPA benchmarks require pH values to be between 6.0 and 9.0. Discharges with acidic pH values indicate the likely presence of other pollutants that may cause or threaten to cause pollution, contamination, or nuisance.  Pollutants that negatively affect pH values are known to have adverse effects on aquatic life and habitats in the San Francisco Bay Waters. Pentair has discharged effluent into storm water with pH exceeding acidity effluent limitations on multiple occasions. See Exhibit A.

35.    These violations have continued with Pentair's last sample results from 2013-2014, which show exceedances of the EPA thresholds over 7 times for aluminum, copper, iron, zinc, and TOC, in addition to pH violations.

36.    Not only are these sample results indicative of violations of effluent limitations, they indicate discharges of pollutants and materials other than storm water in violation of the Storm Water Permit and the Act. These pollutants are known to degrade water quality and have adverse effects on aquatic life and habitats in the San Francisco Bay.

37.    As of the date of the May Notice, Pentair had not revised its SWPPP to address these routine violations of the Storm Water Permit. The failure to do so violates Receiving Water Limitation C(3) of the Permit, and these violations have continued since the first exceedances of the EPA Benchmarks on or before April 7, 2009.

38.    Pentair has failed to collect at least two storm water samples from all discharge points during each of the past five years as required by the Monitoring and Reporting Requirements of the Storm Water Permit, Section B(7)(a). According to Pentair's SWPPP, the Facility has 11 drainage points, including 10 storm drains and one valley gutter. Storm Water Pollution Prevention Plan, Pentair Corporation, dated November 25, 2013 ("2013 SWPPP"), Figure 1. Pentair, however, has consistently failed to sample and analyze from each of these

1  discharge points. See 2009-2010 Annual Report, 2010-2011 Annual Report, 2011-2012 Annual

2  Report, 2012-2013 Annual Report (all samples taken and analyzed in last 5 years come from

3  only one drainage location).

4      39.   Although under some circumstances, facilities may reduce the number of storm

5  water samples collected based on a determination that two or more drainage areas are

6  substantially identical, this determination must be supported and documented, as required by the

7  Storm Water Permit, Section B(7)(c). Pentair has provided insufficient support or

8  documentation in its SWPPP and annual reports to allow a reduction in the number of storm

9  water samples. Failure to sample storm water from each of the Facility's discharge points each

10  year, and in each instance, constitutes additional and separate violations under the CWA.

11      40.   Compounding its violations, in the wet season for 2009-2010 Pentair submitted

12  false reports. Pentair did not provide lab results for samples it collected on October 13, 2009

13  and March 19, 2010. See 2009-2010 Annual Report; Storm Water Permit Permit, Sections B(5)

14  and B(14). The lab results from March 19, 2010 appear to be falsely submitted and are, in fact,

15  lab results from March 1, 2009. In 2009-2010 Pentair also failed to make quarterly observations

16  and monthly wet season observations as required under the Storm Water Permit. *Id.* at Section

17  B(3) and B(4). The Storm Water Permit specifically requires that facility operators submit

18  quarterly observations and monthly wet season observations, along with adequate

19  documentation for sampling from two storm events of the wet season. Pentair's failure to

20  submit the required analysis in 2009-2010 shows a further disregard for the Storm Water Permit

21  requirements and constitutes additional violations under the CWA.

22      41.   The Storm Water Permit requires facilities to analyze samples for all toxic

23  chemicals and other pollutants that are likely to be present in storm water discharges in

24  significant quantities. Based on the EPA's Enforcement and Compliance History Online,

25  Detailed Facility Report ("ECHO Report") for Pentair, the Facility handles significant amounts

26  of antimony compounds. On information and belief, it is likely that antimony is being

27  discharged into the Facility's storm water and not appropriately analyzed and reported. All

28

facilities covered by the Storm Water Permit must analyze samples for "all toxic chemicals and other pollutants that are likely to be present." Pentair has submitted no analysis for antimony.

42.    Pentair has not adequately described materials it handles or adequately determined whether individual chemicals in these materials are present in storm water discharged from the Facility. Pentair admitted in its 2013 SWPPP to using and/or handling a wide array of materials at the Facility, which are not described in sufficient detail to determine the likely pollutants from industrial activities that may be discharged from the site in storm water. Any failure to analyze all likely pollutants is ongoing, and every day Pentair fails to adequately examine all significant pollutants discharged into its storm water is another violation of the CWA and Storm Water Permit.

43.    Pentair has not developed or implemented a SWPPP that meets the requirements of the Storm Water Permit. Pentair has failed, and continues to fail, to identify all significant materials and to develop and implement adequate BMPs to prevent the exposure and subsequent discharge of pollutants at levels that do not impair the receiving water body of the San Francisco Bay. With the exception of zinc, the significant materials list in Pentair's SWPPP fails to identify specific materials (that are likely significant) and insufficiently informative for the Water Board and public to understand the materials being handled. The SWPPP site map is insufficiently detailed. These deficiencies render the SWPPP inadequate. Pentair therefore has been daily and continuously in violation of its SWPPP requirements every day since at least April 7, 2009.

44.    Despite continuing violations of the Storm Water Permit, Pentair has not revised its SWPPP as necessary to ensure compliance with effluent and discharge limitations. Every day that the Facility operates without revising and correcting the deficiencies in its SWPPP is a separate and distinct violation of the Storm Water Permit and the CWA. Pentair therefore has been daily and continuously in violation of its SWPPP requirements every day since at least April 7, 2009.

## PLAINTIFFS' CLAIMS

### FIRST CAUSE OF ACTION

**Discharges of Materials Other Than Storm Water
in Violation of Permit Conditions and the Act**

45.     Paragraphs 1 - 43 of this Complaint are hereby realleged and incorporated by reference herein.

46.     Section 301 of the Clean Water Act makes unlawful "the discharge of any pollutant by any person," unless in compliance with a permit issued under the NPDES. 33 U.S.C. §§ 1311(a), 1342.

47.     Storm water from the Facility is regulated pursuant to the Storm Water Permit which prohibits discharges of materials other than storm water directly or indirectly to waters of the United States. The Storm Water Permit also prohibits the discharge of toxic and deleterious substances and rubbish, refuse, and other solid waste to any place where they would eventually be transported to surface waters.

48.     Pentair has discharged materials other than storm water, including toxic metals, TOC, oil and grease, solids, and pH-affective substances at levels greater than EPA benchmarks and Basin Plan effluent limits on a regular and continuing basis to the storm drains that discharge to the San Francisco Bay with each storm event.

49.     Every day Pentair has discharged and continues to discharge materials other than storm water from the Facility in violation of the Storm Water Permit is a separate and distinct violation of Sections 301(a) and section 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342. These violations are ongoing or likely to recur.

### SECOND CAUSE OF ACTION

**Violation of Permit Conditions and the Act**

50.     Paragraphs 1 - 48 of this Complaint are hereby realleged and incorporated by reference herein.

51.     Pentair violated the Storm Water Permit and the Act by repeatedly exceeding the EPA benchmarks in the Permit. The repeated exceedance of these benchmarks is conclusive evidence that Pentair has not implemented BAT or BCT as part of its SWPPP.

52.     Pentair violated the Storm Water Permit and Act by repeatedly violating the pH limits in the Basin Plan. The repeated exceedance of this effluent limitation is conclusive evidence that Pentair has not implemented BAT or BCT as part of its SWPPP.

53.     Every day Pentair has discharged and continues to discharge polluted storm water from the Facility in violation of the Storm Water Permit is a separate and distinct violation of Sections 301(a) and section 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342. These violations are ongoing or likely to recur.

## THIRD CAUSE OF ACTION

**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan and Monitoring and Reporting Program**

54.     Paragraphs 1 - 52 of this Complaint are hereby realleged and incorporated by reference herein.

55.     Pentair has violated the Storm Water Permit and the Act by failing to develop or implement a SWPPP that meets the requirements of the Storm Water Permit to identify all significant materials used at the Facility and to develop and implement adequate BMPs to prevent the exposure and subsequent discharge of pollutants at levels that do not impair the receiving water body of the San Francisco Bay.

56.     Pentair has violated the Storm Water Permit and the Act by failing to include in its SWPPP a sufficiently detailed site map, including with nearby water bodies (such as the San Francisco Bay).

57.     Pentair has violated the Storm Water Permit and the Act by failing to develop and implement a Monitoring and Reporting Plan that meets the requirements of the Storm Water Permit by failing and continuing to fail to monitor storm water discharges for toxic materials that it uses and stores at the Facility, including antimony.

58.     Pentair has violated the Storm Water Permit and the Act by failing to revise its SWPPP as necessary to ensure compliance with effluent and discharge limitations, despite continuing violations of the Storm Water Permit, including exceedances of EPA benchmarks. Every day that the Facility operates without revising and correcting the deficiencies in its

SWPPP is a separate and distinct violation of the Storm Water Permit and the CWA. Pentair therefore has been daily and continuously in violation of its SWPPP requirements every day since at least April 7, 2009.

59.   Pentair has repeatedly violated Sections B(5)(a) and B(7)(a) of the Storm Water Permit by failing to sample at least two storm events per wet season from all of its storm water discharge points.

60.   Each day since at least April 7, 2009, that Pentair has failed to develop and implement an adequate SWPPP for the Facility, and to revise the SWPPP to address on-going pollution in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing or likely to recur.

**RELIEF REQUESTED**

WHEREFORE, Plastic Pollution Coalition respectfully request that the Court grant the following relief:

     a.     Enter a declaratory judgment that Defendant Pentair has violated and is in violation of the CWA, 33 U.S.C. §§ 1311(a) and 1342;

     b.     Order or Enjoin Defendant Pentair to cease the discharge of pollutants from point sources into waters of the United States without a valid NPDES Permit;

     c.     Order Defendant Pentair to comply with all effluent limitations and other terms and conditions of coverage under the Storm Water Permit;

     d.     Order or Enjoin Defendant Pentair to cease discharge of pollutants into the storm drains and into the San Francisco Bay;

     e.     Order Defendant Pentair to pay civil penalties of up to thirty-seven thousand five hundred dollars ($37,500) per day for each day of each violation of the CWA set out in this Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. § 1319(d) and 1365(a);

     f.     Award Plaintiff its costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

     g.     Grant such other and further relief as the Court deems just and appropriate.

Dated: August 26, 2014

                               /S/ Rachel S. Doughty

                 By: _____

                               Rachel S. Doughty, Esq.
                               Greenfire Law

                               GARY DAVIS, ESQ
                               JAMES BIRKELUND, ESQ